STATE OF MAINE                                                     SUPERIOR COURT

Cumberland, ss.

STATE OF MAINE
Cumberland. ss. Clerk's Office

OCT 26 2015

RECEIVED

RONALD RIDEOUT

    Plaintiff

  v.                                                    Docket No. PORSC-CV-12-0481

JACKRABBIT LIMITED LIABILITY COMPANY

    Defendant

 and

CNA/SMRT, INC.

    Intervenor

## ORDER ON MOTIONS TO ENFORCE SETTLEMENT

This case is before the court on (i) the Motion to Intervene and to Enforce a Settlement by CNA/SMRT, Inc. dated December 1, 2014, and (ii) Defendant's Motion to Enforce a Settlement filed by Defendant Jackrabbit Limited Liability Company ("Jackrabbit") dated August 26, 2015.

This is a personal injury case commenced after Plaintiff Ronald Rideout, a professional engineer employed by the SMRT architectural firm, sustained injuries by slipping on ice and falling in his employer's parking lot, which is alleged to be owned and maintained by Defendant Jackrabbit. In addition to filing this case, Mr. Rideout filed a workers compensation claim for his injuries and has been receiving benefits from CAN/SMRT.

Both motions seek specific enforcement of what Jackrabbit and CNA/SMRT contend was a legally binding agreement to settle this reached as a result of discussions among the attorneys for Mr. Rideout, Jackrabbit and CNA/SMRT. Mr. Rideout contends that the agreement reached among the attorneys is not binding on him because it was not fully

1

integrated, because he did not actually authorize it, and because he lacked sufficient mental capacity to understand and be bound by it.

CNA/SMRT was granted leave to intervene in order to enforce the alleged settlement agreement by means of its motion to enforce. Jackrabbit thereafter filed its own motion to enforce.

The motions were consolidated for an evidentiary hearing commenced on August 20, 2015 and completed October 7, 2015. All parties presented evidence in the form of sworn testimony and exhibits. Following the hearing, the parties submitted proposed findings of fact and conclusions of law, at which point the court took the motions under advisement.

The issues raised are:

1.    Was the settlement agreement developed among counsel an integrated and enforceable contract?

2.    Did Mr. Rideout have the mental capacity to enter into an enforceable settlement agreement with Jackrabbit?

3.    Did Mr. Rideout actually authorize attorney Peter Attorney Clifford to enter into a binding settlement agreement?

Based on the entire record, the court hereby adopts the following findings of fact and conclusions of law, and denies both motions, on the ground that Mr. Rideout did not actually authorize attorney Clifford to enter into a binding settlement agreement on Mr. Rideout's behalf.

### Findings of Fact

1.    Plaintiff Ronald Mr. Rideout ("Mr. Rideout") filed this civil action against defendant Jackrabbit, seeking damages from injuries he received as the result of falling in the parking lot of his employer, SMRT, Inc. As a result of the same injuries, Mr. Rideout was also

2

receiving workers compensation benefits from SMRT's workers' compensation insurer, CNA. Attorney Peter Attorney Clifford represented Mr. Rideout in this case. Attorney Peter Del Bianco represented Jackrabbit in the defense of this case. Attorney Thomas Quartararo represented the workers compensation carrier, CNA/SMRT.

2.      Pursuant to Rule 16B of the Maine Rules of Civil Procedure, the parties engaged in alternative dispute resolution (ADR) in July 2013, with attorney Christopher Dinan serving as the ADR neutral. The case was not resolved through ADR.

3.      After the failed ADR effort, Attorney Clifford told Mr. Rideout he was unwilling to take this case forward to trial, and would be seeking leave to withdraw as Mr. Rideout's attorney in this case.   They agreed that, notwithstanding his withdrawal, Attorney Clifford would continue to negotiate towards a settlement on Mr. Rideout's behalf. Attorney Clifford thereafter filed a motion to withdraw as counsel for Mr. Rideout, which the court granted on October 11, 2013.   Attorney Clifford nonetheless continued to represent Mr. Rideout during settlement negotiations, and he continued to file motions with this court on Mr. Rideout's behalf.   Attorney Clifford considered his continued services to Mr. Rideout following his withdrawal from this case to constitute limited representation as permitted by the Maine Rules of Professional Conduct.

4.      On August 26, 2013, Attorney Del Bianco counsel for Jackrabbit, sent an email to Attorney Clifford conveying an offer to settle Mr. Rideout's claims for $40,000.

5.      On November 7, 2013 Attorney Clifford sent an email to Attorney Del Bianco, copying Christopher C. Dinan, Esq., stating Mr. Rideout was willing to settle this case case for $60,000, but the portion of the settlement to be withheld to satisfy the statutory workers compensation lien was not yet resolved.   Later that day Attorney Clifford sent a second email

3

to Attorney Del Bianco, again copying Christopher C. Dinan, Esq., this time stating he would be working with Mr. Rideout to wrap up the settlement documents.

6.    Counsel for one or more of the parties advised the court that the case was settling, and the court responded by issuing an Order To File Docket Entries dated November 7, 2013, setting a 30-day deadline to complete the filings associated with settlement.

7.    On November 15, 2013, Attorney Clifford replied to an email from Attorney Del Bianco regarding a workers' compensation and MaineCare lien, advising Attorney Del Bianco the deal – which in this context is clearly the settlement of the Mr. Rideout claim against Jackrabbit – called for $5,000 to be paid to a workers' compensation carrier. He identified Attorney Quartararo as counsel for that carrier. Attorney Clifford also advised he would be getting Attorney Del Bianco the MaineCare lien.

8.    On November 19, 2013 Attorney Clifford forwarded an email to Attorney Del Bianco, stating "Here is the WC lien agreement." Intervenor Exhibit 2A, at PDB0004 to PDB0005. That forwarded email included (i) an email from Attorney Quartararo dated October 31, 2013 setting forth certain terms relating to the separate but associated workers' compensation action, and (ii) an email from Attorney Clifford to Attorney Quartararo dated November 7, 2013 in which Attorney Clifford represented Mr. Rideout had agreed to those terms presented by Attorney Quartararo. Those terms included $5,000 of the $60,000 settlement proceeds would be paid to the workers' compensation carrier to satisfy its lien on that settlement.

9.    Also on November 19, 2013, Attorney Clifford sent Attorney Del Bianco another email advising Attorney Del Bianco that Bruce Coffin of MaineCare had confirmed MaineCare had no lien in this case. Jackrabbit Exhibit 12.

4

10. That same day Attorney Del Bianco sent an email back to Attorney Clifford attaching two documents, which he identified as (i) "our Settlement and Indemnity Agreement" (Intervenor Exhibit 2A, at PDB0006 to PDB0007) and (ii) "the Medicare Addendum" (Intervenor Exhibit 2A, at PDB0008 to PDB0011). In that email, Attorney Del Bianco stated he understood Attorney Clifford had confirmed with MaineCare there was no MaineCare lien. Attorney Del Bianco further explained he was including the Medicare Addendum because he recalled Mr. Rideout had applied for and obtained SSDI and would therefore have been Medicare eligible. Attorney Del Bianco completed that email by stating he would have Middlesex issue two checks, one for $55,000 payable to Mr. Rideout and Attorney Clifford's firm, and the other for $5,000 payable to Mr. Rideout and CNA Insurance Company, the workers' compensation carrier. Intervenor Exhibit 2A, at PD0004. This Settlement and Indemnity Agreement set forth the terms of a settlement of Mr. Rideout's civil action against Jackrabbit, and that settlement included a total payment of $60,000 to or on behalf of Mr. Rideout. See also, Jackrabbit Exhibit 11.

11. On November 20, 2013 Attorney Del Bianco sent Attorney Clifford a revised Medicare Addendum (Intervenor Exhibit 2A, at PDB0013 to PDB0015) that differed from the earlier Medicare Addendum only in including Attorney Clifford as a signatory. Jackrabbit Exhibit 17, p. 3.

12. Attorney Clifford sent the Settlement and Indemnity Agreement, and the Medicare Addendum, to Mr. Rideout for his consideration. Testimony of Attorney Clifford, October 7, 2015.

13. On December 4, 2013 Attorney Clifford advised Attorney Del Bianco he needed more time to manage a lump sum hearing for the associated workers' compensation action. Attorney Del Bianco agreed to that extension. Jackrabbit Exhibit 13.

5

14. On December 12, 2013, Attorney Clifford sent an email to Attorney Del Bianco seeking a further postponement of the lump sum hearing and Jackrabbit settlement until Mr. Rideout received confirmation from Social Security and Medicare that there would be no liens or offsets. Jackrabbit Exhibit 14.

15. Mr. Clifford thereby made it clear to Jackrabbit's counsel that the settlement under discussion could not be consummated until it was clear how much of the $60,000 settlement would actually redound to Mr. Rideout's benefit instead of go to reimbursing payors of various benefits.

16. Meanwhile, on December 7, 2014, Attorney Clifford filed the first of a series of motions to extend the deadline for completing the settlement. The court granted this initial motion to extend in December, and during 2014 granted the subsequent motions in the series, extending the deadline into late 2014.

17. On April 3, 2014, Attorney Clifford sent an email to Attorney Del Bianco and Attorney Quartararo advising them "Medicare has finally issued a letter indicating there is no lien and the file is closed." He stated they needed to set up a lump sum settlement hearing, at which time all releases would be exchanged, funds disbursed, and a Stipulation of Dismissal would be filed in the Superior Court case. Jackrabbit Exhibit 15.

18. On April 14, 2014 Attorney Clifford wrote to the Workers' Compensation Board, requesting he attend a May 6, 2014 Lump Sum Settlement hearing by telephone, and stating the settlement primarily deals with a reduction in the lien repayment relating to the associated third party liability case. Jackrabbit Exhibit 16.

19. On April 29, 2014 Attorney Del Bianco again sent Attorney Clifford a Settlement and Indemnity Agreement, and Addendum to Release, for signatures, and he also demanded a letter from Attorney Clifford stating Medicare would be fully reimbursed before he

6

distributes the settlement proceeds to his client. Jackrabbit Exhibit 17. That same day, Attorney Clifford responded to Attorney Del Bianco, copying Attorney Quartararo, stating he would momentarily send him a revised Medicare letter dated 3/31/14 indicating a zero balance with Medicare. Attorney Clifford further pointed out that zero Medicare balance was no surprise because Mr. Rideout's workers' compensation insurance was obliged to cover all the medical bills caused by his accident. *Id.*

20. On May 5, 2014 Attorney Clifford sent an email to a Shari Leveille, copying both Attorney Quartararo and Attorney Del Bianco, advising them Mr. Rideout was leaning toward rejecting the proposed workers' compensation lump sum settlement that was set for a hearing for the following day. Jackrabbit Exhibit 18. Shortly after sending that email, he sent another to Attorney Del Bianco and Attorney Quartararo advising them "I believe Ron is set to accept the liability settlement and payback the comp lien w/o a lump sum discount/reduction." *Id.* Attorney Del Bianco replied by stating they will need to redo the settlement documents and the checks in light of the workers' compensation lien. *Id.*

21. Later that day Attorney Del Bianco advised Attorney Clifford and Attorney Quartararo that the settlement checks he had, including a $5,000 check for the workers' compensation lien, would have to be reissued, noting the repayment to CNA (the workers' compensation carrier) would now be much higher without a lump sum settlement of that claim. Jackrabbit Exhibit 19. Attorney Clifford acknowledged that email, stating he thought they had that larger number somewhere, and he then sent another email to Attorney Quartararo asking if he received Attorney Del Bianco's email. *Id.*

22. On May 15, 2014 Attorney Quartararo, as counsel for CNA/SMRT, Inc. in the claim asserted by Ronald Mr. Rideout before the Maine Workers' Compensation Board (WCB File No. 09034487), sent an email to counsel stating the workers' compensation claim was not

7

settling, and also stating he would provide the updated workers' compensation lien information if the Mr. Rideout/Jackrabbit case settled. Jackrabbit Exhibit 20. Attorney Clifford responded by stating they would have to review the attorney's fees and costs to calculate the adjusted statutory lien. *Id.* Attorney Del Bianco responded that same day stating Attorney Clifford and Attorney Quartararo should determine the workers' compensation lien and then let him know that number so he could obtain the appropriate checks for settling the civil case. *Id.*

23.     On May 27, 2014, Attorney Quartararo sent email correspondence to Attorney Clifford and Attorney Del Bianco identifying a total of $34,140.57 in indemnity and medical bill payments that had been made by CNA on Mr. Mr. Rideout's workers' compensation claim. In that email correspondence, Attorney Quartararo offered to settle a workers' compensation lien that would be created by any settlement of Mr. Rideout's civil action for that amount less 1/3rd for attorney fees plus documented costs. Intervenor Exhibit 1A, at TQ0001 to TQ0002 and TQ0006 to TQ0007.

24.     That same day, Attorney Quartararo had a further email exchange with Attorney Del Bianco, in which Attorney Clifford was copied, after which Attorney Quartararo concurred the lien amount was $22,760.38 less a pro rata share of the litigation costs. Intervenor Exhibit 1A, at TQ0006.

25.     Attorney Del Bianco then sent Attorney Clifford an email asking if he had the signed release from Plaintiff Mr. Rideout, indicating Attorney Del Bianco and his carrier wanted to close this file. Intervenor Exhibit 1A, at TQ0006.

26.     Over May 29 and 30, 2014, Attorney Quartararo, Attorney Del Bianco and Attorney Clifford participated in email exchanges through which they collectively reached an agreement that the amount of the CNA lien would be set at $21,125.00. Intervenor Exhibit 1A,

8

at TQ0005. However, Mr. Clifford had not discussed with Mr. Rideout the amount of the CNA lien, and did not have authority to settle the case on the basis of that lien amount.

27. Attorney Del Bianco then, on May 30, 2014, sent Attorney Clifford an email asking Attorney Clifford to let him know when he had a signed release, and telling Attorney Clifford he would then request two settlement checks: (i) a two party check for $21,125.00 to Attorney Quartararo's client and Plaintiff Mr. Rideout, and (ii) a two party check for $38,875.00 to Plaintiff Mr. Rideout and Attorney Clifford. Intervenor Exhibit 1A, at TQ0004 – TQ005.

28. Following that email, and still on May 30, 2014, Attorney Quartararo sent an email to Attorney Clifford advising him to remind Plaintiff Mr. Rideout of the "holiday" his client would receive on any further workers' compensation expenses and payments for the balance of the settlement funds minus fees. Intervenor Exhibit 1A, at TQ0004.

29. On June 2, 2014, Attorney Clifford sent a reply email to Attorney Quartararo, stating "Yes that's been done" and adding Attorney Quartararo should also understand that Attorney Clifford and Mr. Rideout would expect Attorney Quartararo's client to reimburse 33% of all medical and/or indemnity benefits to reflect attorney's fees going forward until such "holiday" is used up. Intervenor Exhibit 1A, at TQ0004.

30. By June 2, 2014 Attorneys Attorney Clifford, Attorney Quartararo and Attorney Del Bianco had therefore engaged in further discussions aimed at reaching an agreement over the workers' compensation lien that would be created by the $60,000 settlement of Mr. Rideout's claim against Jackrabbit. In these additional discussions Attorney Clifford had advised counsel there was no MaineCare lien and no Medicare lien. Attorney Clifford informed Attorney Quartararo he had advised Mr. Rideout the workers' compensation carrier would receive a "holiday" for any further workers' compensation expenses and payments for the

balance of the settlement funds minus fees. However, based on Mr. Rideout's testimony at the hearing that he did not understand the payment holiday concept or its effect on the settlement, the court is unable to find that he had a clear understanding of this material provision of the pending settlement.

31. During the course of these additional discussions Attorney Del Bianco had sent Attorney Clifford revised versions of his Settlement and Indemnity Agreement and Addendum to Release, but all counsel acknowledged those would have to be further revised to reflect the new workers' compensation lien amount.

32. However, at no time during these discussions during the spring of 2014 had Mr. Rideout actually authorized Attorney Clifford to settle the case on the terms discussed among the three attorneys. In fact, during the spring and summer of 2014, Mr. Rideout underwent two extended periods of in-patient treatment for severe mental illness at two psychiatric hospitals. He has bipolar disorder, and, at various times during the spring and summer of 2014 was experiencing delusional and psychotic thoughts that significantly affected his perception of reality, and did in fact render him incapable, at least at different points in 2014, of making complex personal or financial decisions, such as settling a lawsuit.

33. Mr. Rideout's second psychiatric hospitalization in 2014 began August 10 and lasted seventeen days. From the fact that Mr. Rideout was hospitalized for so long, the court infers his mental state was such as to render him incompetent to make a knowing, voluntary and intelligent decision regarding settlement, at least during the seventeen-day period. After his release from the psychiatric facility on August 27, 2014, Mr. Rideout was able to resume contact with Attorney Clifford about settlement. However, his mental health needs continued, and his medical records reflect that he had seven appointments for mental health treatment during the eight weeks after leaving hospital August 27.

10

34. During October 2014, Mr. Rideout and Attorney Clifford resumed their communications about settlement by email and by telephone. Jackrabbit Exhibit 28; Intervenor Exhibit 3; Jackrabbit Exhibit 31; testimony of Attorney Clifford, October 7, 2015; testimony of Mr. Rideout, October 7, 2015. Attorney Clifford contacted Mr. Rideout on October 2, 2014 because he was hoping to effectuate a liability settlement before a deadline set by the Court for completing such a settlement expired the following month. Jackrabbit Exhibit 27 and testimony of Attorney Clifford, October 7, 2015.

35. On October 15, 2014 Attorney Clifford and Mr. Rideout had a lengthy telephone conversation that Attorney Clifford summarized just afterward in a memorandum written for the file. Attorney Clifford was aware Mr. Rideout had experienced mental health issues, so he made a point of noting in his memorandum that Mr. Rideout seemed very lucid and intelligent during the telephone call. Testimony of Attorney Clifford, October 7, 2015.

36. He also documented Mr. Rideout was having trouble paying his bills and that he would like the money from the liability case. Attorney Clifford also recorded Mr. Rideout did not want to give up his workers' compensation rights, and that he wanted to place the workers' compensation lien amount from the liability settlement in escrow.

37. Mr. Rideout was, at this time, going through what he termed a "temporary financial problem." Although he was receiving roughly $1,800/month in social security disability benefits, he was spending all his money and that was causing his financial problem. Testimony of Mr. Rideout, October 7, 2015.

38. At some point during 2014, Mr. Rideout had begun working with Chelsea Suvlu, one of the workers compensation advocates who provide no-cost legal services to assist injured workers with their claims before the Maine Workers Compensation Board.

39. On October 16, 2014 Attorney Clifford sent an email to Attorney Del Bianco, copying Attorney Quartararo, stating Mr. Rideout had suggested he would be able to settle his liability case against Jackrabbit if the workers' compensation lien was placed in escrow in Attorney Clifford's IOLTA account pending resolution of his workers' compensation claim. Jackrabbit Exhibit 22.

40. Between October 17 and October 20, 2014, Attorney Clifford and Attorney Quartararo exchanged additional emails regarding this new proposal from Mr. Rideout of having the workers' compensation lien placed in escrow, pending settlement of the workers' compensation case, in order to facilitate Mr. Rideout's settlement of his civil action against Jackrabbit. Jackrabbit Exhibit 23 and Jackrabbit Exhibit 24.

41. On October 22, 2014, Attorney Clifford sent an email to Attorney Del Bianco and Attorney Quartararo in which he first confirmed recent discussions on this case and stating (a) the $60,000 settlement of the liability case had been pending for some time, and (b) the workers' compensation case was proceeding forward. He then stated in that email that his client, Mr. Rideout, had recently instructed him to settle that liability case and to put the workers' compensation lien in his escrow account pending resolution of the workers' compensation case. Attorney Clifford also stated Attorney Quartararo had agreed to this arrangement on that day, and that Attorney Quartararo's client had waived its right to subrogation against Attorney Del Bianco's client so that the Mr. Rideout/Jackrabbit LLC case can resolve. Attorney Clifford concluded that email by stating he would have Mr. Rideout sign the release documents that had been prepared by Attorney Del Bianco. Intervenor Exhibit 1A, at TQ0012.

42. Immediately after Attorney Clifford sent his October 22, 2014 email to Attorney Del Bianco and Attorney Clifford, advising them Mr. Rideout had recently instructed him to

settle that liability case and to put the workers' compensation lien in his escrow account pending resolution of the workers' compensation case, he forwarded that email to Mr. Rideout with the following message: "Ron – Per your recent instructions. fyi . . . release to follow by mail and email today." Jackrabbit Exhibit 29.

43. The following day, on October 23, 2014, Attorney Del Bianco sent an email to Attorney Clifford with the revised settlement documents. In so doing, he pointed out to Attorney Clifford that (i) he had removed the language regarding the allocation of settlement proceeds that was in lines 2 and 3 on page one of the earlier Settlement and Indemnity Agreement, and that he had re-dated that document; and (ii) for the Addendum, he had only re-dated it. Attorney Del Bianco also advised Attorney Clifford he had dictated a separate release for Attorney Quartararo's client that he would be sending to Attorney Quartararo later that day. Attorney Del Bianco finished that email by asking Attorney Clifford when he thought he could get his documents signed by Plaintiff Mr. Rideout. Intervenor Exhibit 1A, at TQ0011 and Intervenor Exhibit 2A, at PDB0017 to PDB0018.

44. Those revised settlement documents were (i) the Settlement and Indemnity Agreement (Intervenor Exhibit 2A, at PDB0019 to PDB0020) and the Addendum to Release (Intervenor Exhibit 2A, at PDB0021 to PDB0023). In a separate October 23, 2014 letter, Attorney Del Bianco sent Attorney Quartararo a Release and Waiver of Worker's Compensation Lien and of Subrogation to be completed by CNA. Intervenor Exhibit 2A, at PDB0025 to PDB0027.

45. On October 23, 2014, Mr. Rideout sent an email to Attorney Clifford, replying to Attorney Clifford's "Per your instructions email" from the previous morning, stating the following:

> I'm sorry that you went forward with a settlement. I thought you
> were going to talk to Chelsea about it as she said there was no

13

way to do it. I am living hand to mouth and owed my landlord money so I had been inclined to have to settle. It looks like I'm going to be good financially so there is no need to settle. Besides after what you said yesterday about this being worth $1 Mil, I would be stupid to settle. If you want out then call Bornestein.

Jackrabbit Exhibit 30.

From this email, it is crystal-clear that Mr. Rideout actually believed that Attorney Clifford was going to confer with Mr. Rideout's workers compensation advocate before continuing with the settlement dialogue. It is also clear that Mr. Rideout believed his advocate's position to be that the settlement as contemplated was unworkable—"she said there was no way to do it." Whether Mr. Rideout actually ever directed Mr. Clifford to confer with the advocate before proceeding with settlement discussions is unclear, and exactly what his advocate had told Mr. Rideout about the feasibility of settlement is also unclear. But what is clear from Mr. Rideout's email is that he did not expect, nor had he in fact actually authorized, attorney Clifford to complete the settlement without conferring with the workers compensation advocate first, to determine whether the proposed settlement could be completed without jeopardizing Mr. Rideout's objectives for his workers compensation claim.

46. On the other hand, there is also nothing to indicate that Attorney Clifford understood, or should have understood, that he was not in fact authorized to proceed with the settlement. His October 16 memorandum to the file makes no mention of Mr. Rideout having directed him to confer with the advocate. It is therefore possible that Mr. Rideout never specifically directed attorney Clifford to confer with the workers compensation advocate before proceeding with settlement.

47. Attorney Clifford responded to Mr. Rideout's email the same afternoon with an email to Mr. Rideout summarizing their recent communications and also pertinent historical points. Jackrabbit Exhibit 31. Among other things, Attorney Clifford wrote, "As you have

14

noted in today's emails, last week you were inclined to accept the pending $60,000 liability settlement (to pay bills). This week, you have indicated you want to try the liability case, as well as the workers comp case."

48. Later in the day of October 23, 2014, Attorney Clifford sent an email to Attorney Del Bianco and Attorney Quartararo stating he had just learned Mr. Rideout was "not interested in a settlement at this time." Intervenor Exhibit 1A, at TQ0010.

49. There was then an exchange of emails between Attorney Del Bianco and Attorney Clifford (i) in which they noted their mutual surprise in this assertion by Mr. Rideout, and (ii) regarding Attorney Clifford's request to give Mr. Rideout additional time to secure new counsel. Intervenor Exhibit IA, at TQ00010 - TQ0009.

*Application of Law to Fact*

The parties largely agree on the framing of issues and on the applicable law, and also agree on most of the underlying facts. Where they part company is on how the law applies to the largely undisputed facts and what inferences are to be drawn.

The issues as this Order will address them are as follows:

(1) Was the agreement that was developed as the result of discussion among the attorneys sufficiently integrated as to material terms to constitute an enforceable contract?

(2) If so, did Mr. Rideout actually authorize Attorney Clifford to accept the terms of the contract?

(3) If so, did Mr. Rideout suffer from a mental health condition that rendered his authorization and therefore the contract voidable by him?

On the first two issues, the Defendant and Intervenor have the burden of persuasion. In other words, they have burden to show that the settlement agreement constitutes an integrated, enforceable contract, and that Mr. Rideout is bound by it because he actually

15

authorized it. The reason why the Defendant and Intervenor have the burden on the second issue is simply that any party seeking to enforce a contract has to prove mutual assent by the parties as an element of the claim. *See Lane v. Maine Cent. R. Co.*, 572 A.2d 1084, 1085 (Me.1990) (party seeking to enforce settlement agreement negotiated by opposing party's counsel had the burden to prove opposing counsel was "acting within his authority"). In this case, Defendant and Intervenor claim Mr. Rideout assented to the terms of what they claim to be a binding settlement agreement by actually authorizing Attorney Clifford to convey his assent. Regarding the third issue, lack of competence to enter into contracts is in the nature of an affirmative defense, so Mr. Rideout has the burden of persuasion.

*Existence of an Integrated Enforceable Agreement*

"Settlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact. We have recognized a distinction between a preliminary "agreement to agree" and a binding settlement agreement. In order to be binding, a settlement agreement requires the mutual intent of the parties to be bound by terms sufficiently definite to enforce." *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶6, 968 A.2d 539, 541, *citing Marie v. Renner*, 2008 ME 73, ¶7, 946 A.2d 418, 420; *White v. Fleet Bank of Me.*, 2005 ME 72, ¶13, 875 A.2d 680, 683; *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶9, 760 A.2d 1041, 1044.

The discussion among attorneys did not produce an integrated agreement until October 20, 2015, when the agreement regarding placing a portion of the settlement proceeds in escrow was finalized. However, as of that date, the terms of settlement were documented in emails among counsel and in the various settlement documents that Attorney Del Bianco had prepared and provided to Attorney Clifford for review. A party will be bound to a contract even where the necessary mutual assent was communicated by email. *See McClare v. Rocha*, 2014 ME 4, ¶12, 86 A.3d 22, 26.

16

Accordingly, the Defendant and Intervenor have met their burden to establish that, by October 22, 2014, the attorneys had developed a proposal to settle the case that was sufficiently complete and integrated to constitute an enforceable contract upon being agreed to by the parties. Whether Mr. Rideout agreed to it is the next question.

*Whether Mr. Rideout Actually Authorized Attorney Clifford to Enter into a Binding Settlement Agreement*

The analysis therefore turns to whether the Defendant and Intervenor have proved that Mr. Rideout assented to the agreement that had been developed by the attorneys. The answer to that question depends, in turn, on whether Mr. Rideout actually authorized Attorney Clifford to enter into a binding agreement to settle this case.[1]

Under Maine law, "there are two types of actual authority -- express authority or implied authority; both are to be distinguished from apparent authority. Express authority is that authority which is directly granted to or conferred upon the agent in express terms by the principal. Implied authority, however, is actual authority circumstantially proven from the facts and circumstances attending the transaction in question." *Libby v. Concord Gen. Mut. Ins.*

---

[1] In this case, the Defendant and the Intervenor are not arguing their position on the basis of the apparent authority doctrine. Their proposed findings of fact and conclusions of law submitted after the hearing—as well as the case on which they primarily rely—rest on an actual authority analysis. *See Michaud v. Nexxlinx of Maine, Inc.*, 2014 U.S. Dist. LEXIS 141522.

Moreover, it is by no means clear that an apparent authority would be legally sufficient in this context. Neither party has cited to any Maine decision in which a settlement agreement made by an attorney on behalf of a client was enforced without proof that the client had assented to the terms of the settlement. The case primarily relied on by the Defendant and Intervenor involved a specific finding by the court that the client against whom the settlement agreement was being enforced had authorized his attorney to accept it. *See id.*, 2014 U.S. Dist. LEXIS 141522.

Further, the record here does not support an apparent authority argument, which would require some evidence that Rideout had held out Attorney Clifford to the Defendant and the Intervenor as having authority to settle the case without his express consent, and there is no evidence of such import.

*Co.*, 452 A.2d 979, 981-82 (Me. 1982), *quoting Stevens v. Frost*, 140 Me. 1, 7, 32 A.2d 164, 167 (1943) (internal quotes, citations and ellipses omitted).

Although the issue is not entirely clear, the rule in Maine appears to be that an attorney needs a client's express authorization in order to settle a case. It has been "a long established principle in Maine and many other jurisdictions that 'an attorney clothed with no other authority than that arising from his employment in that capacity has no power to compromise and settle or release and discharge his client's claim.'" *Perkins v. Philbrick*, 443 A.2d 73, 74 (Me. 1982), *quoting Pomeroy v. Prescott*, 106 Me. 401, 407, 76 A. 898 (1910). *See also Lane v. Maine Central Railroad, supra*, 572 A.2d at 1084-85 (settlement negotiated by attorney not binding on client who did not actually agree to it). The Maine Rules of Professional Conduct echo this principle in requiring that the decision to settle a civil case be made only by the client, not by the lawyer. *See* Me. R. Prof. Cond. 1.2, Comment (1).[2]

The Defendant and Intervenor argue that Mr. Rideout's express consent to the terms of settlement was not necessary, as long as Attorney Clifford reasonably believed that express consent had been given. Their post-hearing filing contends that "if the agent's understanding is reasonable, he has actual authority to act in accordance with that understanding, even if the principal later shows the agent was mistaken." Intervenor's And Defendant's Proposed Post-Hearing Findings Of Fact And Conclusions Of Law On Motions To Enforce Settlement, at 18, *citing* RESTATEMENT (THIRD) OF AGENCY § 2.02, cmt. c.

This indeed is the law of principal-agent generally, but that law does not necessarily transpose in its entirety into the attorney-client relationship. The Maine case of *Lane v. Maine Central Railroad Company* plainly indicates that an out-of-court settlement agreement is not

_____

[2] This apparently was not always the rule in Maine. *See Bonney v. Morrill*, 57 Me 68, 74 (1869) ("[T]he employment of a counsellor and attorney at law to prosecute a suit . . . carries with it an authority to such attorney, to compromise the claim . . . if he deems it best for the interest of his client . . .")

18

binding on the client, regardless of what the attorney might believe, unless the client has actually agreed to it. 572 A.2d 1084, 1085 (Me.1990).

Thus, the fact that Attorney Clifford was acting on behalf of Mr. Rideout for purposes of settlement did not give him implied authority to settle this case in the course of negotiations with opposing counsel, without Mr. Rideout's express consent. Thus, the precisely framed issue is, have the Defendant and Intervenor proved that Mr. Rideout expressly consented to the terms of settlement agreed to on his behalf by Attorney Clifford?

This court's answer is that they have not, based on a combination of several points in the evidence. First, Mr. Rideout's email response to Mr. Clifford—" I'm sorry that you went forward with a settlement. I thought you were going to talk to Chelsea about it as she said there was no way to do it"—could hardly be plainer in indicating that Attorney Clifford was not authorized to settle the case without conferring with the workers compensation advocate about whether the settlement was workable. Second, Mr. Rideout's claim that he did not understand—and thus had not agreed to—some aspects of the settlement, such as the payment holiday concept and how it would work in this case—is credible and not refuted in the evidence. Third, Mr. Rideout was recovering from mental illness sufficiently severe to require an in-patient psychiatric hospitalization of seventeen days. While this may not have rendered him legally incompetent as of October 22-23, 2014, it has a definite bearing on whether he gave a knowing and intelligent assent to the settlement.

Because the Defendant and Intervenor have failed to meet their burden on proof of Mr. Rideout's assent, the inquiry need not address the issue of whether Mr. Rideout's mental illness meant that his mental health condition rendered him legally incapable of entering into a binding contract. As just noted, his mental health condition is a relevant factor in the court's determination that he did not assent to the settlement proposal developed by the attorneys, but

it is not the dispositive factor. The dispositive factor is that Mr. Rideout did not authorize Attorney Clifford to assent to the settlement agreement on his behalf, without first consulting with Mr. Rideout's workers compensation advocate.

The failure of Defendant and the Intervenor to prove assent by Mr. Rideout plainly distinguishes this case from the case on which they rely, *Michaud v. Nexxlinx of Maine, Inc.*, 2014 U.S. Dist. LEXIS 141522.

Accordingly, it is hereby ORDERED: The Motion to Enforce a Settlement filed by Intervenor CNA/SMRT, Inc. dated December 1, 2014, and Defendant Jackrabbit LLC's Motion to Enforce a Settlement dated August 26, 2015 are hereby denied.

As far as the court is aware, the entry of this Order brings to an end the reason for CNA/SMRT's intervention. Counsel for Plaintiff and Defendant are requested to confer and submit a proposed schedule for the remainder of this case. For counsel's guidance in that endeavor, the court is prepared to consider reopening discovery and resurrecting other deadlines up to a point, but, given the length of time the case has been pending, the court intends to bring it to trial as soon as the schedule permits.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated October 26, 2015

A. M. Horton
Justice

STATE OF MAINE
Cumberland. ss Clerk's Office
OCT 26 2015
RECEIVED

20

Humphrey Johnson, Esq.
Intevenor

David Van Dyke, Esq.
Plaintiff

Peter Del Bianco, Esq.
Defendant